2017 IL App (1st) 162149

SIXTH DIVISION
Opinion filed: August 11, 2017

No. 1-16-2149

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| JAMES MADDEN, as Successor Trustee of the Kathleen R. Madden Trust Under the Trust Agreement dated November 15, 1995; and ELIZABETH McDONNEIL and JENNIFER OBERHEIDE, as Successors in Interest to the Kathleen R. Madden Trust Under the Trust Agreement dated November 15, 1995, | ) ) ) ) ) ) ) | Appeal from the Circuit Court of Cook County |
| Plaintiffs and Counterdefendants-Appellees, | ) ) | |
| v. | ) ) | No. 09 CH 19679 |
| THOMAS R. SCOTT and SYLVIE SCOTT, | ) ) | |
| Defendants and Counterplaintiffs-Appellants, | ) ) | |
| (Boardwalk of Park Ridge Condominium Association, Counterdefendant). | ) ) ) | Honorable Rita Novak, Judge, Presiding. |

PRESIDING JUSTICE HOFFMAN delivered the judgment of the court, with opinion.
Justices Rochford and Delort concurred in the judgment and opinion.

**OPINION**

¶ 1 The defendants and counterplaintiffs, Thomas R. Scott and Sylvie Scott, (hereinafter referred to as the Scotts), appeal from orders of the trial court: (1) granting both an implied easement and an easement by prescription over a portion of a condominium unit owned by them for purposes of ingress to, and egress from, an adjoining condominium unit; (2) granting an

injunction, permanently enjoining them and the subsequent owners of their condominium unit from, *inter alia*, interfering with, or obstructing, the use of the easement by the owners of the adjoining condominium unit; (3) directing them to remove certain specified personal property from the easement and enjoining them from placing those or similar items in the easement; (4) directing that the sliding glass door which allows access to the easement from the outside remain unlocked until the door is rekeyed and the owners of the adjoining unit are given duplicate keys to the lock; (5) providing that the court's orders shall run with the land; and (6) denying their motion to remove a cloud on the title to their condominium unit. For the reasons which follow, we affirm the orders of the trial court.

¶ 2    The following factual recitation is taken from the pleadings on file, the evidence introduced during the trial of this cause, and the trial court's factual findings based upon that evidence.

¶ 3    Lou Elliot constructed six condominium units as models for a planned condominium development. The six model units were numbered 10, 20, 30, 40, 50, and 60. Only Units 50 and 60 are involved in this litigation. Units 50 and 60 are adjacent, with Unit 60 being to the east of Unit 50.

¶ 4    Elliot abandoned the project, and at the request of the LaSalle National Bank, the project was taken over by Howard Sellergren. At the time that Howard Sellergren came into title to the project, the basic construction of Units 50 and 60 was complete, including a vestibule area adjoining both units (hereinafter referred to as the vestibule). The vestibule is approximately 9 feet along its eastern and western sides and 20 feet along its northern and southern sides. The majority of the vestibule is located within the boundaries of Unit 50 with a small portion located within the boundaries of Unit 60. At the time that Howard Sellergren took over the project, the

southern side of the vestibule consisted of windows and a sliding glass door leading to the exterior of the building in which units 50 and 60 are located. The sliding glass door is located in that portion of the vestibule which lies within the boundaries of Unit 50. On the north wall of the vestibule is the front door to Unit 50 and on the east wall is the front door to Unit 60. There is a door to Unit 50's garage located on the west wall of the vestibule. There is also a door to Unit 50 which opens to a patio on the north side of the building. The front door to Unit 60 is located within that portion of the vestibule that is within the boundaries of Unit 60. However, to access the front door to Unit 60 from the outside, one must enter through the sliding glass door and then cross a portion of the vestibule located within the boundaries of Unit 50. There are four other doors to Unit 60; two leading to a patio on the west side of the building, one on the southeast corner of the unit leading to its garage, and one on the northeast corner of the unit.

¶ 5     After coming into title to Units 50 and 60, Howard Sellergren did additional work to the units, including the installation of a decorative front door to Unit 60 and tile on the vestibule floor. He also installed mailboxes for both Unit 50 and Unit 60 outside of the sliding glass door leading to the vestibule and placed the unit numbers 50 and 60 on the outside of the building above the sliding glass door.

¶ 6     On February 8, 1982, Howard Sellergren transferred title to Unit 60 either to his brother, James Sellergren, or into a land trust, the beneficiary of which was his brother. James Sellergren and his wife resided in Unit 60 for about 2 years. In the period during which James Sellergren resided in Unit 60, he and his family members commonly entered Unit 60 through the door from the garage. However, guests accessed Unit 60 by entering the building through the sliding glass door on the south side of the vestibule, crossing over a portion of Unit 50 located within the vestibule, and entering Unit 60 through its front door. In addition, packages intended for the

occupants of Unit 60 were dropped off in the vestibule, directly in front of the door to Unit 60. During the period that James Sellergren occupied Unit 60, the sliding glass door in the vestibule was never locked.

¶ 7     On October 20, 1982, Howard Sellergren transferred title to Unit 50 to Thomas Woelfle. In 1983, Ann Matturo purchased Unit 50, and in 1995, she rented the unit to the Scotts. Sometime in 2002 title to the unit was transferred into a trust with Yetta Matturo Weiland, Ann Matturo's daughter, as trustee. Ms. Weiland testified that the layout of the vestibule, the location of the front doors to Units 50 and 60, the mailboxes for both units, and the exterior unit numbers remained the same from the time that her mother purchased the unit until it was sold to the Scotts in May 2006. According to Ms. Weiland, the sliding glass door on the south side of the vestibule was never locked, and the vestibule was the means of access to the front doors of both Unit 50 and Unit 60.

¶ 8     Joseph W. Madden, Jr. and Kathleen R. Madden (hereinafter referred to as the Maddens) purchased Unit 60 on June 30, 1986, and took up residence there. At the time of their purchase, the mail boxes and door bells for both Unit 50 and Unit 60 were located on the exterior of the building next to the sliding glass door leading to the vestibule, and the unit numbers were located on the exterior of the building above the sliding glass door. Title to Unit 60 was transferred by the Maddens to Kathleen R. Madden as trustee of the Kathleen R. Madden Trust, u/t/a dated November 15, 1995 (hereinafter referred to as the Madden Trust). At all times relevant, the Maddens, their family members and guests entered the building through the sliding glass door, crossed over the vestibule, and entered Unit 60 through the front door. Jennifer Oberheide, one of the Maddens' daughters, testified that she used the front door to Unit 60 located in the vestibule when she visited her parents, but about four years before the trial, or in 2011, she began

using the door from the garage when entering and exiting the unit as the sliding glass door leading to the vestibule was locked. James Madden, Joseph W. Madden Jr.'s brother, testified that, about four years before trial, he too began using the door from the garage when entering and exiting Unit 60.

¶ 9    The Scotts moved into Unit 50 in 1995 as tenants of Ann Matturo and purchased the unit on May 4, 2006. According to Thomas R. Scott, during the time that he lived in Unit 50, he never saw anyone use the door in the vestibule area to enter Unit 60. He stated that he never saw the Maddens use the sliding glass door to enter or exit the vestibule.

¶ 10    On June 20, 2006, the Scotts informed the Maddens that they, the Scotts, owned the "lion's share" of the vestibule. Thereafter, the Maddens continued to access Unit 60 through the vestibule, and Thomas R. Scott admitted that he never told the Maddens that they could not use the vestibule.

¶ 11    On June 17, 2009, the Scotts obtained a permit to build a wall in that portion of the vestibule located within the boundaries of Unit 50 and posted the permit in the vestibule. On June 19, 2009, the Maddens and the Madden Trust filed the instant action against the Scotts, asserting claims of an express easement over the vestibule area by virtue of the declaration of condominium encumbering the title to both Unit 50 and Unit 60, an implied easement to use that portion of the vestibule within the boundaries of Unit 50 for the purpose of ingress and egress to and from Unit 60, and a prescriptive easement for the same purposes.

¶ 12    The Scotts filed a counterclaim against the Maddens and the Madden Trust which was later amended. In count I of the amended counterclaim against the Madden Trust and Joseph W. Madden, Jr., the Scotts sought a declaration of their ownership to that portion of the vestibule lying within the boundaries of Unit 50. Count IV of the amended counterclaim was against the

Boardwalk at Park Ridge Condominium Association, and sought the same relief as count I. Counts II and III of the amended counterclaim were dismissed and are not the subject of this appeal. In addition, the Scotts filed a motion seeking an order directing the Maddens and the Madden Trust to remove the cloud on their title to Unit 50 arising from the recording of both a "Memorandum of Determination by Boardwalk of Park Ridge Condominium Association Regarding Ownership[,]" providing that the vestibule area is a limited common element belonging to the condominium association and a "Second Consolidated, Amended and Restated Declaration of Condominium for the Boardwalk of Park Ridge Condominium Association" which also provided that the vestibule area is a limited common element belonging to the condominium association. The trial court denied that motion on July 15, 2013.

¶ 13    On August 9, 2013, Kathleen R. Madden died and James Madden became the successor trustee of the Madden Trust. In February 2014, James Madden, in his capacity as trustee of the Madden Trust, was substituted into the case as party plaintiff. Joseph W. Madden, Jr. continued residing in Unit 60 until his death on November 14, 2015. On February 22, 2016, Joseph W. Madden Jr.'s daughters, Elizabeth McDonneil and Jennifer Oberheide, in their capacity as successors in interest to the Madden Trust, were substituted into this action as party plaintiffs.

¶ 14    On April 28, 2016, following a bench trial, the trial court entered its Memorandum Opinion and Judgment, holding, *inter alia*, that there exists both an implied easement and an easement by prescription for ingress to, and egress from, Unit 60 over that portion of the vestibule located within Unit 50. The trial court entered judgment: (1) against the plaintiffs on their claim of an express easement over the vestibule; (2) in favor of the plaintiffs and against the Scotts on the plaintiffs' claims for both an implied easement and an easement by prescription over that portion of the vestibule located within the boundaries of Unit 50; (3) in favor of the

Scotts and against the plaintiffs on count I of the Scotts' counterclaim; and (4) in favor of the Scotts and against the condominium association on count IV of the Scotts' counterclaim. In addition, the trial court found that the plaintiffs were entitled to an injunction preventing the Scotts from unreasonably interfering with their rights to ingress and egress over the vestibule and directed the plaintiffs to prepare a proposed injunction order.

¶ 15   On July 1, 2016, the trial court entered a permanent injunction, providing, *inter alia*, that: (1) the Scotts and their successors in interest are prohibited from in any way interfering with the owners of Unit 60's right of passage through that portion of the vestibule located within the boundaries of Unit 50; (2) the Scotts were to remove certain specified personal property from the vestibule area and refrain from placing similar property in the vestibule; and (3) the sliding glass door in the vestibule shall remain unlocked until a properly functioning lock can be installed and the owners of both Unit 50 and Unit 60 are given keys. In addition, the order provides that the covenants contained therein shall run with the land and bind, and inure to the benefit of, the present and future owners of Units 50 and 60.

¶ 16   The Scotts filed the instant appeal arguing that the trial court erred in finding either an implied easement or a prescriptive easement over that portion of the vestibule lying within the boundaries of Unit 50. In the alternative, they argue that, if this court affirms the trial court's finding of either an implied or prescriptive easement, the matter should be remanded to give them "an opportunity to contest the terms of the permanent injunction through counsel who do not have a conflict of interest." Finally, the Scotts request that we reverse the trial court's order of July 15, 2013, and either order the cloud on their title to Unit 50 be removed or remand the matter to the trial court for that purposes.

¶ 17    In its Memorandum Opinion and Judgment, the trial court held that the plaintiffs had proven all of the required elements for the establishment of both an implied easement and a prescriptive easement.  In so holding, the trial court made a number of factual findings which we will not disturb on review unless they are against the manifest weight of the evidence. *Schulenburg v. Signatrol, Inc*., 37 Ill. 2d 352, 356 (1967).

¶ 18    We first address the propriety of the trial court's holding that all of the elements necessary for the establishment of an implied easement were proven.  The Scotts argue that there can be no implied easement in this case because there was no use of that portion of the vestibule lying within the boundaries of Unit 50 before the ownership of Units 50 and 60 was severed. They also contend that the imposition of an implied easement is not necessary to the beneficial enjoyment of Unit 60 due to the existence of four other doors providing ingress and egress to and from the unit.  However, our examination of the record leads to the conclusion that the trial court's finding that an implied easement exists over that portion of Unit 50 located within the vestibule for purposes of ingress and egress to and from Unit 60 is not against the manifest weight of the evidence.

¶ 19    In the case of *Frantz v. Collins*, 21 Ill. 2d 446, 449-50 (1961), our supreme court held that:

> "The doctrine of implied easements is based upon the principle that, in the absence of an expressed contrary agreement, a conveyance imparts a grant of property with all the benefits and burdens which existed at time of sale, and it is designed to give effect to the actual intent of the parties as shown by the facts and circumstances of a particular case.  [Citations.]  It is generally held where the owner of a single tract has arranged or adapted it so that one portion thereof

derives a benefit from the other of an apparent and continuous character, and then sells one of such parts without mention being made of these incidental uses, the grantee takes his property with all the rights and obligations which formerly existed. [Citations.] It is not required that the alleged easement be essential to the enjoyment of the claimants' property but it is sufficient if it would be highly convenient and beneficial thereto. [Citations.] The word 'apparent' as used in this connection does not necessarily mean notorious visibility, *** but refers rather to a use which is either known or could have been discovered upon reasonable inspection. [Citations.]."

¶ 20    It is clear from the evidence of record that, when ownership of both Unit 50 and Unit 60 was vested in Howard Sellergren, the vestibule, including that portion within the boundaries of Unit 50, was the only avenue of access from the outside to the front door of Unit 60. After Howard Sellergren transferred ownership of Unit 60 to James Sellergren or his trust, the only avenue of access from the outside to the front door of Unit 60 remained over that portion of the vestibule within the boundaries of Unit 50; and has so remained until the trial of this cause. It follows, therefore, that Unit 60 derived a benefit from access to its front door over that portion of the vestibule located within the boundaries of Unit 50. Although access to Unit 60 through its front door is not essential due to the existence of four other doors to the unit, the trial court found that access to the front door of the unit from the vestibule is beneficial to the enjoyment of Unit 60, and we agree. Further, the use of the vestibule as a means of access to the front door of Unit 60 was obvious to any owner of Unit 50. We conclude, therefore, that the evidence of record supports the trial court's finding that each of the elements necessary for the establishment of an

implied easement over that portion of Unit 50 located within the vestibule for purposes of ingress and egress to and from Unit 60 has been satisfied.

¶ 21     The Scotts next argue that the trial court erred in holding that the plaintiffs proved all of the elements necessary for the establishment of a prescriptive easement over that portion of Unit 50 located within the vestibule.  According to the Scotts, the evidence of record did not establish an uninterrupted and continuous use for a period of 20 years.  They also contend that the original use of the vestibule area for the benefit of unit 60 was neither adverse or under a claim of right.  We disagree.

¶ 22     "To establish an easement by prescription, the use of the way in question must have been—for a 20-year period—adverse, uninterrupted, exclusive, continuous, and under a claim of right."  *Nationwide Financial LP v. Pobuda*, 2014 IL 116717, ¶ 27.  An easement by prescription is a nonpossessory right to enter upon and use real property in the possession of another.  *Id*. ¶ 28.  There is no requirement that the owner of the servient parcel be deprived of use or possession of the real property at issue.  " 'Exclusive' in the context of a prescriptive easement claim 'does not mean that no one may or does use the way, except the claimant of the easement. It means no more than that his right to do so does not depend upon a like right in others, and it does not mean that the claim is necessarily well founded.' "  *Id*. (quoting *Petersen v. Corrubia*, 21 Ill. 2d 525, 531 (1961)).  "[A] claimant's use may be 'exclusive' within the meaning of this rule, even though the owner of the fee title to the land also makes use of the road or way in question."  *Id*.; see also *Look v. Bruninga*, 348 Ill. 183, 190 (1932); *Schmidt v. Brown*, 226 Ill. 590, 599 (1907).

¶ 23     The trial court found that the use of the vestibule by the Maddens and their guests as a means of access to the front door of Unit 60 was adverse, uninterrupted, exclusive, continuous,

and under a claim of right for a period of 20 years. In their arguments addressed to the trial court's finding of a prescriptive easement, the Scotts have contested only the plaintiffs' satisfaction of the elements of adverse use under a claim of right and continuous and uninterrupted use for a period of 20 years. They have not challenged the trial court's finding of exclusivity. We assume, therefore, that the Scotts do not disagree with the trial court's finding as to that element, and we will address only the specific arguments which they have made. *Chicago Title Land Trust Co. v. JS II, LLC*, 2012 IL App (1st) 063420, ¶ 36.

¶ 24 On the issue of whether the plaintiffs satisfied the elements of continuous and uninterrupted use for a period of 20 years, the Scotts acknowledge that a party claiming a prescriptive easement may use "tacking" to establish use of the claimed easement for a 20-year period. See *Nationwide Financial LP*, 2014 IL 116717, ¶ 27 ("Where there has been privity between users, periods of use may be tacked together to satisfy the requisite prescription period."). They argue, however, that to avail one's self of the use by a previous owner for purposes of "tacking," the party claiming the easement must establish both privity with the previous owner and that the use at issue was continuous and uninterrupted for the full 20 years. See *id*. According to the Scotts, the evidence failed to establish either the use of the vestibule from the time that James Sellergren moved out of Unit 60 until the Maddens purchased the unit on June 30, 1986, or that the Maddens' predecessor in title used the vestibule as a means of ingress and egress to and from the front door of Unit 60. They contend, therefore, that the trial court erred in applying "tacking" to satisfy the 20-year use period required for the establishment of a prescriptive easement. See *Deboe v. Flick*, 172 Ill. App. 3d 673, 676-77 (1988).

¶ 25 We may affirm the judgment of the trial court for any reason apparent from the record, regardless of the reason relied upon by the trial court. *Freedberg v. Ohio National Insurance*

*Co.*, 2012 IL App (1st) 110938, ¶ 26. Although the trial court employed "tacking" as the basis for concluding that the plaintiffs had established the 20-year continuous and uninterrupted use necessary for the establishment of a prescriptive easement, we believe that the record established that the Maddens' period of use itself satisfied the 20-year continuous and uninterrupted use requirements.

¶ 26    The trial court found that the Maddens' use of the vestibule as a means of access to the front door of Unit 60 was "interrupted" on June 20, 2006, when the Scotts "claimed their exclusive right to the western part of the *** [vestibule], 10 days short of 20 years." However, our reading of the record reveals that Thomas R. Scott testified that, on June 20, 2006, he told the Maddens that he and his wife owned the "lion's share" of the vestibule. There is no evidence in the record that the Scotts asserted their right to the exclusive use of any portion of the vestibule or told the Maddens that they could no longer use the vestibule as a means of accessing Unit 60. Rather, the evidence established that the Maddens and their family continued to use the vestibule as a means of access long after June 20, 2006. Both Jennifer Oberheide and James Madden testified that their use of the vestibule as a means of ingress and egress to and from Unit 60 through the front door continued until approximately 2011. There is no evidence in the record supporting a finding that the Maddens' use of the vestibule as an avenue for access to Unit 60 was in any way interrupted until sometime in 2011 when Jennifer Oberheide found the sliding glass door leading from the outside to the vestibule locked. We believe, therefore, that use of the vestibule, including that portion within the boundaries of Unit 50, by the Maddens and their family from June 30, 1986, until 2011 was continuous and uninterrupted for the requisite 20-year period.

¶ 27    In their reply brief, the Scotts contend that the Maddens' argument that their use of the vestibule continued uninterrupted until 2011 "directly conflicts with an express stipulation that the Maddens made in the circuit court." In support of that assertion, the Scotts reference a statement in the Maddens' post-trial motion which states that "[t]he termination date for establishing a prescriptive easement is June 2006, and the threshold date for establishing a prescriptive easement would be twenty years earlier (*i.e.* June 1986)." However, far from being a stipulation that their use of the vestibule for access was interrupted and ended on June 20, 2006, the referenced statement in the Maddens' post-trial motion is a correct, but vague, statement of the 20-year period necessary for the establishment of a prescriptive easement. The Maddens purchased Unit 60 on June 30, 1986, and according to the testimony of Jennifer Oberheide and James Madden, the use of the vestibule as a means of ingress and egress to and from the front door of Unit 60 continued until 2011. Consequently, the 20-year period necessary for the establishment of a prescriptive easement was satisfied by the Maddens' use of the vestibule for access to Unit 60 from June 30, 1986, through June 30, 2006, some five years before the use was interrupted when the sliding glass door to the vestibule was locked.

¶ 28    The Scotts also argue that there is no evidence that the original use of the vestibule as a means of access to the front door of Unit 60 was adverse. They contend that James Sellergren's testimony that his brother knew that he was using the disputed area to let people into Unit 60 and did not mind "at all" established that his use of the vestibule was permissive rather than adverse. The argument might have some relevance to the issue of whether the period of time that James Sellergren occupied Unit 60 could be tacked in order to satisfy the 20-year use requirement for the establishment of a prescriptive easement. However, the argument is irrelevant to the issue of whether the Maddens' use of the vestibule for the period from June 30, 1986, through June 30,

2006, was adverse to the owners of Unit 50. Although the use of the vestibule as a means of access to the front door of Unit 60 may have been permissive so long as James Sellergren occupied Unit 60 and his brother Howard owned Unit 50, that permissive use ended when Howard Sellergren transferred ownership of Unit 50 to a stranger, Thomas Woelfle, on October 20, 1982. See Restatement (Third) of Property (Servitudes) § 2.16, cmt. f, illus. 19 (2000).

¶ 29     The question of whether a use is either permissive or adverse and under a claim of right is a question of fact to be resolved by the trial judge. *Rush v. Collins*, 366 Ill. 307, 314 (1937); *Schultz v. Kant*, 148 Ill. App. 3d 565, 569 (1986). " '[A]dverse' and 'claim of right' are synonymous terms that are equated with use that is not subordinate to the owner's title. [Citation.] It is not essential that there should be proof that the claimant of an easement made any oral declaration of a claim of right, but it will suffice if the facts show that he acted so as to indicate that he did claim the right to such use." *Nationwide Financial LP*, 2014 IL 116717, ¶ 43. In this case, the Maddens openly used the vestibule, including the portion located within the boundaries of Unit 50, as a means of access to the front door of Unit 60. There is no evidence in the record that they did so with permission or license from the Scotts or the previous owner of Unit 50. We believe, therefore, that the trial court's finding that the Maddens' use was adverse and under a claim of right is not against the manifest weight of the evidence.

¶ 30     Based upon the foregoing analysis, we conclude that the trial court's finding that the use of the vestibule as a means of ingress and egress to and from the front door of Unit 60 was adverse, uninterrupted, continuous, and under a claim of right for a period of 20 years or more is not against the manifest weight of the evidence. Therefore, we find no error in the trial court's determination that the plaintiffs proved all of the elements for the establishment of a prescriptive easement.

¶ 31 In their final argument addressed to the trial court's finding of an easement, either implied or by prescription, the Scotts argue that "[t]here is no precedent for granting an easement of any kind over the interior living space of a condominium unit." We find two flaws in the argument. First, that portion of the vestibule area over which the trial court found both an implied easement and a prescriptive easement, although located within the boundaries of Unit 50, is located in an area outside of the unit's living space. When the condominium building in which Units 50 and 60 are located was constructed, the enclosed vestibule was located outside of the living space of either unit. Second, although the easement in this case is over a portion of a condominium unit, it is nonetheless an easement over real property, and we find no reason to deviate from the traditional requirements for the establishment of easements over any other form of real property.

¶ 32 In summary, we conclude that the trial court's judgment in favor of the plaintiffs on count II of their complaint, the implied easement claim, and its judgment in favor of the plaintiffs on count III of their complaint, the prescriptive easement claim, are neither against the manifest weight of the evidence nor contrary to law.

¶ 33 Alternatively, the Scotts request that, in the event that this court affirms the trial court's finding of either an implied or prescriptive easement, we remand the matter back to the trial court to give them an opportunity to contest the terms of the permanent injunction "through counsel who do not have a conflict of interest." They argue that, when the trial court denied their attorney's motion to withdraw, it should have deferred consideration of the plaintiffs' proposed injunction until they were represented by "un-conflicted" attorneys. However, the Scotts failed to cite any authority in support of their argument in this regard, and therefore, the issue has been forfeited. Ill. S. Ct. R. 341(h)(7) (eff. Jan. 1, 2016).

¶ 34    As their final issue, the Scotts argue that we should reverse the trial court's order of July 15, 2013, denying their motion seeking the removal of the cloud on their title to Unit 50 and order the removal of the cloud or remand the matter to the trial court for that purpose.  However, they failed to identify any error in the entry of the order or cite any authority in support of their argument.  Consequently, this issue too has been forfeited.  Ill. S. Ct. R. 341(h)(7) (eff. Jan. 1, 2016).

¶ 35    For the reasons stated, we affirm the trial court's judgment of August 28, 2016, injunction order of July 1, 2016; and order of July 15, 2013.

¶ 36    Affirmed.